# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00437-CV

**Hyde Park Baptist Church, Appellant**

**v.**

**Tara Turner and Terry Curtis, Individually and as next friends
of P.C., a minor, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
### NO. D-1-GN-05-000495, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Turner and Curtis, individually and as next friends of their son, P.C., (collectively, the "Curtis family"), brought suit against Hyde Park Baptist Church ("Hyde Park") and a Hyde Park employee, Sue Lowry, alleging that P.C. had been physically, emotionally, and verbally abused by Lowry over a period of six months while enrolled in Hyde Park's daycare program. The jury found that Lowry intentionally injured P.C. and that Hyde Park's negligence contributed to his injuries.[1] On appeal, Hyde Park argues that the trial court erred in allowing damage awards for future mental anguish and future medical expenses and that the jury's allocation of comparative responsibility between Lowry and Hyde Park was against the great weight and preponderance of the evidence. We affirm the trial court's judgment on the verdict.[2]

---

[1] Lowry settled with the Curtis family prior to trial.

[2] The Curtis family's motion for leave to file its supplemental letter brief is granted.

# BACKGROUND

P.C.'s parents enrolled him at Hyde Park's daycare center in April 2004, when P.C. was a little over a year old. In August 2004, P.C. was placed in a toddler class, for which Lowry was the lead teacher. The Curtis family presented evidence at trial that P.C. suffered mistreatment and abuse during the six months that he remained in Lowry's classroom, culminating in an incident that occurred on January 18, 2005. On that date, Renee Ratliff, a teaching assistant working in Lowry's classroom, witnessed Lowry use her hip to knock P.C. to the ground, causing him to hit his head on the tile floor.[3] According to Ratliff, P.C. began crying in pain when his head hit the ground and Lowry walked away without comforting him or administering first aid.

Ratliff immediately reported the incident to Shelly Miller, another teacher at Hyde Park. Miller, after looking up the definition of abuse in the Texas Family Code and forming the opinion that what had happened to P.C. constituted abuse, shared the information with Wanda Baylor Johnson, the elementary coordinator for the daycare center. Miller also informed Johnson that she had personally seen Lowry knock P.C. and other children to the ground in the past and that she believed that P.C. was the recipient of Lowry's rough treatment more often than other children.[4] The next day, Johnson held a meeting with two other administrators at Hyde Park, Director Ginny Braden and Assistant Director Janie Basham. Braden, Basham, and Johnson discussed the

---

[3] While Hyde Park took the position at trial that the act was not intentional, the jury unanimously found that Lowry acted intentionally.

[4] Johnson's notes documenting her conversation with Miller were entered into evidence and included the following statement: "Shelly described staff member (Sue [Lowry]) bumping children w/hip and putting her foot out causing child to trip. Has been witnessed by her. Not always the same child but is aware that [P.C.] most often affected."

allegations and came to the conclusion that, according to Johnson, "We did not suspect child abuse." The Hyde Park administrators did not inform P.C.'s parents, the police, or Child Protective Services (CPS) about the incident. Lowry remained in her position as the lead teacher in P.C.'s classroom until January 21, 2005, when Hyde Park administrators suspended her for one week while they investigated the allegations.

While Hyde Park administrators did not report the incident to CPS, Amber Delaney, a teaching assistant at Hyde Park, called CPS herself on January 18, 2005, the day P.C. was injured. P.C.'s parents were not informed that their child had become the subject of a CPS investigation. On January 28, 2005, CPS representatives came to Hyde Park to investigate the charges and Braden informed them that a decision had been made that day to terminate Lowry for failing to complete an incident report about P.C.'s injury. Before Lowry could be terminated, however, she submitted her resignation.

Turner, P.C.'s mother, first learned of the allegations that Lowry had abused her son when she brought P.C. to Hyde Park on January 31, 2005, and was informed that Lowry had resigned. Turner testified that she became concerned when Lowry's replacement, Diana Castillo, failed to give her a satisfactory explanation for Lowry's absence. Turner then questioned Braden about the reason for Lowry's abrupt resignation, speaking to Braden first in person and a second time by telephone. According to Turner, Braden refused to give her an explanation, simply repeating that it was "time for a change." Turner became alarmed by Braden's non-responsiveness and returned to the school to insist on a meeting with Braden. Turner testified that after repeated questioning, Braden ultimately revealed that there had been a report of physical abuse of P.C. by Lowry.

3

When asked at trial whether Braden actually used the word "abuse" to describe what had been reported, Turner answered affirmatively.

The Curtis family presented evidence at trial that Lowry had a long history of mistreatment or inappropriate behavior towards the toddlers in her care, and that many of these incidents had been reported to Hyde Park administrators by parents or other teachers. Ratliff testified that prior to the incident with P.C. on the 18th, she had seen Lowry knock over other children, use her legs to pin children against walls, and jerk on a "walking rope" used for children first learning to walk, causing the children to fall down.[5] Ratliff also testified that, in her opinion, Lowry did not like P.C., treated him differently than the other children, and frequently made negative comments about him.

Delaney, a teaching assistant who spent several months working in Lowry's classroom, testified that she had witnessed multiple incidents of Lowry mistreating the children in her class. These incidents included Lowry intentionally pushing a chair out from under a child, throwing a child onto a naptime mat from a height of two or three feet with such force that, according to Delaney, "I saw her body bounce," depriving children of food, and forcing a child to drink milk by pinning him against her body and pressing the cup to his face, leaving the child gasping for air. Delaney testified that after about a month of observing Lowry's behavior, she began complaining to Hyde Park administrators. In a written statement that was entered into evidence,

---

[5] Miller and Ratliff both testified to witnessing a particular incident that occurred in November 2004 involving the walking rope and a child who had just learned to walk. When the child sat down on the pavement and refused to walk any further, Lowry continued to drag the child across the pavement for one or two feet. Miller testified that she reported this incident to Hyde Park administrators at the time that it occurred and again at the time she reported P.C.'s injury.

4

Delaney stated, "Every two or three days for two weeks, and sometimes on back-to-back days, I would make a complaint about [Lowry's] treatment of the children to the administration. [Assistant Director Basham] told me one day that my statements did not do any good because I was the only witness." After Delaney lodged numerous complaints about Lowry, Hyde Park administrators held a conference in which Delaney was asked to repeat her allegations in Lowry's presence. Delaney complied, and Lowry "brushed the allegations off," according to Delaney's affidavit. After this conference, Delaney requested and received placement in another classroom so that she no longer worked with Lowry.

Director Braden testified regarding multiple complaints she received about Lowry's behavior throughout the time Lowry was employed at Hyde Park. These complaints included five different parental complaints, including a parent and Hyde Park employee who witnessed Lowry "fling her child across the room into some pillows." Braden also testified that at least two teachers had asked to be removed from Lowry's classroom during her tenure as director and that four different teachers had given written documentation of incidents in which they witnessed Lowry treating children in a rough manner. Assistant Director Basham also testified regarding multiple complaints by teachers and parents, including many complaints that Lowry was not "nurturing enough" in her treatment of the children. Lois Gamble, a former director of the daycare center at Hyde Park, also testified to complaints she received regarding Lowry during her tenure as director. These complaints led Gamble to hold a meeting with Lowry in July 1995 and give her a written letter describing the problems, including what many parents perceived to be an "intense body posture." Gamble testified that after presenting Lowry with this letter, she "continued to work with

5

[Lowry] on different types of improvements," but that parents, fellow teachers, and administrators continued to report Lowry's lack of flexibility and affection toward the children, prompting additional meetings with Lowry in an attempt to address these concerns.

The only physical manifestation of P.C. being knocked to the ground on January 18 was a bump on his head that required no medical attention beyond the initial X-ray. However, the Curtis family presented evidence that P.C. sustained psychological harm as a result of Lowry's treatment. P.C.'s treating psychologist, Dr. Mary McCarthy, testified that she diagnosed P.C. with a psychological condition known as adjustment disorder and that, within a reasonable degree of medical probability, the cause of this condition was the abuse he suffered at Hyde Park.[6] McCarthy further testified that regular therapy for a number of years would be necessary to treat P.C.'s adjustment disorder.

The jury found that Lowry's intentional act or acts proximately caused injury to P.C. and that Hyde Park's negligence contributed to his injuries. The jury further allocated fault to find Hyde Park 80% responsible and Lowry 20% responsible. The jury awarded $3,582 for past medical expenses, $34,980 for future medical expenses, $25,000 for past physical pain and mental anguish,

---

[6] McCarthy testified that as a result of his adjustment disorder, P.C. "exercises an overcontrol" when approaching new environments, which "limits what he is willing to take on and explore." According to McCarthy, this limitation prevents P.C. from thinking about tasks "in new and relevant ways, which you need in order to learn new things. So it's really limiting his development." McCarthy observed that when drawing, P.C. "won't grasp the pencil strongly," as if "he was afraid of making a mistake," and that, if left untreated, this problem could prevent P.C. from developing adequate fine motor skills. McCarthy further testified that P.C. suffers from significant levels of anxiety.

and $100,000 for future mental anguish. Hyde Park's subsequent motions for new trial and judgment notwithstanding the verdict were overruled, and this appeal followed.

In three issues on appeal, Hyde Park argues (1) that there was no competent evidence to support an award for future mental anguish, (2) that there was no competent evidence to support an award for future medical expenses, and (3) that the jury's allocation of comparative responsibility between Lowry and Hyde Park was against the great weight and preponderance of the evidence.

**DISCUSSION**

*Future Mental Anguish*

Hyde Park contends that there is legally insufficient evidence to support an award of damages for future mental anguish, an argument first raised in its post-trial motions. A "no-evidence" point of error may be raised for the first time in a motion for judgment notwithstanding the verdict or a motion for new trial. *Cecil v. Smith*, 804 S.W.2d 509, 510-11 (Tex. 1991).[7] In reviewing a no-evidence challenge, we consider all of the evidence in the light most favorable to the party in whose favor the verdict has been rendered and indulge every reasonable inference deducible from the evidence in that party's favor. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). If more than a scintilla of probative evidence supports the finding, the no-evidence

---

[7] When a party contends that there is no evidence to support the submission of a specific element of damages in a broad-form jury question, the party must object before the charge is read to the jury. *Harris County v. Smith*, 96 S.W.3d 230, 236 (Tex. 2002). In the present case, however, the issue of mental anguish damages was not submitted in a broad-form question that included other elements of damages. To the extent that the question was broad form in allowing the jury to award damages based on both Lowry's acts and Hyde Park's negligence, Hyde Park waived any potential complaint regarding the form of the question under *Smith*. *See id.*

7

challenge fails. *Minnesota Mining & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 738 (Tex. 1997). More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Merrell Dow*, 953 S.W.2d at 711.

Hyde Park argues that the Curtis family failed to present evidence of future mental anguish because their claims were improperly based on "subjective" clinical psychological testimony, rather than an objective diagnosis. In support of this argument, Hyde Park urges that the testimony of the Curtis family's expert witness—P.C.'s treating psychologist, Dr. McCarthy—is fundamentally flawed because she is a clinical psychologist rather than a forensic psychologist. Hyde Park attacks McCarthy's methodology, complaining that she "did not testify that [P.C.] had experienced a trauma that had any recognized rate-of-incidence for any psychological condition linked to trauma." Hyde Park also urges that the diagnosis of a clinical psychologist is invalid because it is based on the "self-interested" statements of the patient or his parents, while forensic psychology requires the expert to "look at sources of information outside of the patient's own self-interested statements" and "actually seek[] out independent information."[8]

Hyde Park did not object to McCarthy's designation as an expert witness during trial. "To preserve a complaint that an expert's testimony is unreliable, a party must object to the testimony before trial or when it is offered." *Guadalupe-Blanco River Auth. v. Kraft*, 77 S.W.3d

---

[8] Hyde Park argues that McCarthy's experience providing therapy to children who have been abused renders her an unreliable expert witness, stating, "She has much experience working with victims of abuse, and her focus is on *helping* them deal with these situations. It is certainly commendable that she is emotionally involved in *helping* children, but this is precisely the 'imperfect fit' where the therapist can no longer render a scientifically detached opinion on causation."

8

805, 807 (Tex. 2002); *see also Coastal Transp. Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004) ("[W]hen a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct this analysis."). Having failed to preserve its complaint regarding the reliability of McCarthy's expert-witness testimony, Hyde Park cannot now assert that McCarthy's testimony constitutes "no evidence" on the issue of P.C.'s future mental anguish. *See Coastal Transp.*, 136 S.W.3d at 233 (holding that objection is required to preserve no-evidence challenge based on expert's scientific methodology).

McCarthy testified that she diagnosed P.C. with a psychological condition known as adjustment disorder that, within a reasonable degree of medical probability, had been caused by his experience in Lowry's classroom. In her testimony, McCarthy described at length the objective testing process she used in reaching this diagnosis. She further testified that P.C.'s psychological condition would require both play therapy and family therapy for several years, as well as a reassessment of his condition at the age of six to determine the need for additional therapy. In addition to McCarthy's testimony, both of P.C.'s parents testified regarding negative changes in P.C.'s demeanor and behavior after he was placed in Lowry's classroom at Hyde Park, including that he had become physically aggressive towards other children and the family dog. In light of this evidence, we hold that the Curtis family presented more than a scintilla of evidence of P.C.'s future mental anguish. *See Adams v. YMCA*, 265 S.W.3d 915, 915 (Tex. 2008) (per curiam) (expert testimony regarding reasonable probability of future mental anguish, coupled with testimony of family members regarding behavior after abuse, sufficient to survive no-evidence challenge, even in absence of bodily injury).

9

In addition to its no-evidence challenge, Hyde Park also argues that future mental anguish damages are not available as a matter of law unless there is evidence of serious bodily injury, a "special relationship" between the parties, injuries of a shocking and disturbing nature, or intent or malice by the defendant. *See City of Tyler v. Likes*, 962 S.W.2d 489, 495-96 (Tex. 1997). Hyde Park further contends that none of these objective factors are present in this case, and therefore the Curtis family is not entitled to damages for future mental anguish.

Despite Hyde Park's argument to the contrary, *Likes* does not set forth an exhaustive list of the types of cases in which future mental anguish damages are available. *See id.* at 496 ("The preceding analysis is obviously far from exhaustive . . . . Our opinion today does not attempt the perhaps impossible task of distilling a unified theory of mental anguish from the existing precedents."). However, even if a party were required to demonstrate the existence of one of the factors described in *Likes* in order to recover mental anguish damages, one such factor is present in this case. Under *Likes*, where there is intentional or malicious conduct on the defendant's part, mental anguish damages are recoverable in light of the defendant's "high level of culpability." *Id.* at 495. Hyde Park concedes that Lowry's actions involve a sufficient level of intent or malice to trigger mental anguish damages under *Likes*, stating in its brief on appeal that "there can be no doubt that [Lowry] was found by the jury to have engaged in 'intentional misconduct.' But, *as to the Church*, there was no such 'high level of culpability.'" (Record references omitted.) Because the question on future mental anguish allowed the jury to consider both Hyde Park's negligence and Lowry's intentional acts in determining the proper amount of damages, Lowry's intentional conduct places this case squarely within the "intent or malice" category of cases described in *Likes* for which

10

mental anguish damages are available.[9] While Hyde Park characterizes the award as a recovery for "negligent infliction of emotional distress," the jury question—to which Hyde Park did not object—was presented in a manner that allowed the jury to consider Lowry's intentional acts when awarding damages for future mental anguish.

Because more than a scintilla of evidence supports the jury's award of future mental anguish damages and Texas law does not bar the Curtis family's recovery of such damages in this case, Hyde Park's first issue is overruled.

*Future Medical Expenses*

In its second issue on appeal, Hyde Park argues that there was no competent evidence at trial to support an award of future medical expenses. In support of this argument, Hyde Park reiterates its attack on the reliability of the Curtis family's expert witness, stating that "the only evidence regarding future medical expenses was from Dr. McCarthy, Plaintiffs' psychological expert," and asserting that McCarthy's expert opinion regarding future medical expenses was fundamentally flawed for the same reasons urged regarding her testimony on future mental anguish. As previously discussed, Hyde Park failed to make a timely objection to McCarthy's designation as an expert witness and has therefore waived its right to assert that the underlying methodology of her testimony was so unreliable as to constitute "no evidence" to support an award of future medical expenses. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409 (Tex. 1998) (holding that

---

[9] The relevant question stated, "What sum of money, if paid now in cash, would fairly and reasonably compensate [P.C.] for his injuries, if any, that resulted from the occurrence in question?" A subpart of this question allowed the jury to list an amount for "Mental anguish that, in reasonable probability, [P.C.] will sustain in the future."

11

party must object to expert testimony before or during trial in order to preserve complaint that expert's testimony is unreliable and thus, no evidence); *see also Coastal Transp.*, 136 S.W.3d at 233.

McCarthy testified that the reasonable and necessary cost of P.C.'s future medical care was $34,980, based on her expert opinion regarding P.C.'s need for future play therapy sessions, family therapy sessions, and another psychological evaluation at the age of six. Furthermore, McCarthy testified regarding her conclusion that, within a reasonable degree of medical probability, the abuse P.C. suffered under Lowry's care was the cause of his psychological disorder. In light of Hyde Park's waiver of error, we hold that McCarthy's testimony constitutes more than a scintilla of evidence to support the jury's award of $34,980 for future medical expenses. Hyde Park's second issue is overruled.

*Comparative Responsibility*

In its third issue on appeal, Hyde Park argues that the trial court erred in failing to grant its motion for new trial because the jury's verdict allocating comparative responsibility—20% to Lowry and 80% to Hyde Park—was against the great weight and preponderance of the evidence.

In reviewing the factual sufficiency of a jury verdict, we must weigh all of the evidence in the record and may not overturn the jury's finding unless it is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996).

In challenging the allocation of comparative responsibility, Hyde Park concedes that its own negligence and Lowry's intentional acts are accepted and undisputed for purposes of this

12

appeal. Rather than challenging the jury's findings on these issues, Hyde Park argues that, as a matter of law, a negligent wrongdoer can never bear more responsibility for an injury than an intentional tortfeasor. This proposition is unsupported by Texas law. Chapter 33 of the civil practice and remedies code provides that the jury, as trier of fact, shall determine the proportionate responsibility of each defendant in a tort claim. *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.003 (West 2008). The statute makes no distinction between those defendants who have acted negligently and those found to have committed intentional torts. *See id.* Similarly, Hyde Park has not provided, nor have we found, any precedent in Texas case law that would support a bright-line prohibition on allocating greater responsibility to a negligent defendant than to a defendant who acted intentionally.

The Curtis family presented evidence that Hyde Park administrators had received numerous complaints from parents and teachers regarding Lowry's inappropriate and abusive behavior towards toddlers in her care. Despite these reports, which spanned a period of ten years, Hyde Park chose to retain Lowry as a lead teacher in a classroom with children under the age of two. Even after Hyde Park administrators received reports that Lowry had injured P.C. by intentionally knocking him to the ground, that she had previously knocked other children to the ground, and that she frequently singled P.C. out for rough treatment, Hyde Park left P.C. and his classmates in Lowry's care for several more days. The jury also heard evidence that Hyde Park administrators attempted to conceal Lowry's treatment of P.C.—and his resulting injury—from his parents, even after P.C. had become the subject of a CPS investigation. Given this evidence and the highly deferential standard of review applied to jury verdicts, we cannot conclude that the jury's allocation of proportionate responsibility was so against the great weight and preponderance of the evidence as to be manifestly unjust. Hyde Park's third issue is overruled.

13

## CONCLUSION

Because more than a scintilla of evidence exists to support the damages awards for future mental anguish and future medical expenses and because the jury's allocation of comparative responsibility is not manifestly unjust, we affirm the trial court's judgment.

_____

Diane M. Henson, Justice

Before Justices Patterson, Waldrop and Henson

Affirmed

Filed:   January 30, 2009